3 Shenyang Aluminum v. United States. We understand you're splitting the time this morning. Do you have different arguments or are you just going to tell us the same thing? Yes, I'm Walter Purcell, it's Alan Travis. I'm representing Chen Go, an appellant, and I'll be handling the standing issues. Good morning. Appellants in this case have both statutory standing and Article 3 standing. This is all laid out in our briefs, but what I really want to highlight here is the importance and the nature of the statutory grant of standing in this case under 2631C, which grants direct party standing on a particular class of parties. Importers, exporters, those parties that produce the merchandise. This is important because it's so specific and addresses parties that are likely... What is going to be resolved here? Is it just, it's not your products that are the subject of the scope determination that's at issue, right? So it's just someone else's products and not yours, which will be directly affected, correct? No, I don't agree with that. Scope reviews and determinations cover a class or kind of product that's raised by the person. Somebody requests a scope, they say that we want commerce to determine whether our product or a particular class of products is going to be covered by the scope or not. We import, or the appellants in this case, import that class or kind of product, which is a current law. So what happens, let's assume you have standing and we affirm. Are your products automatically then covered by the results in this case? Because they are the same type of product, they should be covered by it, or the determination by commerce on the scope will apply to the products. Is there going to have to be a new determination made by commerce with respect to your products? No, not necessarily. What does that mean, not necessarily? Yes or no? The scope determination provides clarity to importers who are bringing in the class or kind of merchandise in this case. That determination will be applied to the products of appellants. Automatically applied as a result of the disposition in this appeal? There's always a possibility that for some reason they may or may not, but the absolute certainty as to the application really doesn't go to standing, that really goes to the merits of the case. Can I just ask you about this cash deposit question, which you reference in your briefs, you say substantial cash deposits. Is that still going on or has that been rescinded as a result of the clarification of the instruction? As far as I know, it will still go on. It's going on now, so you are paying cash deposits? Yes, that's my understanding, that cash deposits are still being paid. And liquidation has been suspended, so this determination, when it's applied to our clients, will have that impact. Can I ask you something? You're the Jango? Yes. So in your complaint, which is at 590 of the appendix, you say as a result of Commerce's March 27, 2014 scope ruling, Jango's curtain wall systems and curtain wall units are now subject to the aluminum extrusion orders. That seems to me to be a simple and definitive concession that if the scope ruling, unless it's been materially changed since the March 27, 2014 version, will in fact make you subject to the two orders. Yes, that's our understanding, that determination will. The liquidation of the entries have been suspended. I just want to pick up on something. It feels to me like you're trying to leave a little bit of wiggle room, and I want to understand if there's any wiggle room at all, or if this is a concession that an affirmance of this order will mean that you must pay these duties. An affirmance of the order, I don't believe there's any wiggle room. I don't see it. I believe it will require us to pay. And just to follow up on a procedural point, so you filed your separate complaint, 107, and your colleagues in 108 and Uwanda in 106, and then in July of 2014 there was a consented to consolidation, which is why this is captioned Consolidated Case 106. And then as I understand it, the docket sheets in the two other cases show the cases being closed simply by the filing of the judgment and the order of December 2017. And the judgment includes in the last paragraph a direction that the merchandise that was covered by the December 2014 preliminary injunctions shall be liquidated in accordance with these orders. That includes your merchandise? Correct, it does. And that motion to consolidate was the government's motion. And I believe in doing that there's a recognition that this is all the same product, and that consolidating these cases makes sense because it's going to impact them. See, Congress, when they wrote this statute, recognized that people that import like merchandise are going to be impacted or likely to be impacted. It doesn't have to be 100%. I guess that's what I'm getting at maybe with the wiggle room. Our showing for standing doesn't have to be 100%. It has to show that it's redressable by 100%. I wasn't actually asked about whether it had to, what you had to say, but what you in fact did say, and I think there's a comparable sentence in paragraph three of the Perma Steel Lisa complaint, where it seems to me you do say that, again, you were talking about the original scope ruling of March 2014. And unless something has changed between those two things, you have in fact alleged, and it seems to me you're bound by the allegation, that the two, the anti-dumping and countervailing duty orders will in fact apply. Yes, and to your point, nothing has changed in this case. So nothing, I don't remember the exact time frame of all of this, but this kerfuffle over the instructions and then the rescission of certain, the clarification of paragraph three, that has nothing to do with anything, right? Well, I think that was an effort by the government to try to limit its application in some way or other, but it applies, it doesn't really matter what the government says in terms of how their scope will apply or not. They don't really get to control this court's jurisdiction by those statements. It applies or it doesn't apply. If it's subject merchandise, which is the class of kind of merchandise, and the ruling applies to, scope ruling, applies to that class of kind of merchandise, we have standing to challenge that. Okay, why don't we hear from you. I'm over my time. Thank you. Good morning. Morning. May it please the court. My name is Emily Lawson, and I'm here today on behalf of appellants. This case is about a commerce scope determination in the orders of aluminum extrusions from China. And I am saying that because the appellants are not aluminum extruders. They are, like the petitioner, they design and manufacture curtain wall. So what is specifically at issue here is the scope ruling that confirms where they asked commerce to confirm that complete curtain wall units were imported under a supply contract for a complete curtain wall system were excluded as a finished goods kit or as a finished good. We believe that the issues stem here from the plain language of the scope of the orders and appellant's position rests on commerce's misconstruction or misapplication of this finished goods test or the finished goods scope exclusion language. And that is inconsistent with the practice when they found other products excluded under the finished goods kit. Also, commerce has failed to consider very important aspects of the problem concerning the record evidence about what is finished is the curtain wall and that it assembled as is as a finished good. In addition, we believe that they've ignored what is information that they have to consider under the regulation, specifically language in the petition that provided as an example that the unitized unassembled curtain wall would be excluded as a finished goods kit. Just to clarify one thing, am I understanding correctly that the duties that are applied are applied only basically to the aluminum portions and not to the glass portions of these units? The scope provides that it is just the aluminum extrusions are to be covered and that if you look at the exact scope language, there is that qualification. I assume that reduces the number that you're multiplying, whatever the percentage is, fairly seriously? It would only apply to the aluminum extrusions in this case would be that this product has aluminum extrusion frames. And the units that you are actually importing includes the glass? Yes, they're prefabricated type units and that they include glass and they are finished as we will explain here too, but to be hung on the side of the building, which forms the whole curtain wall structure at the time of import. I guess I'm trying to understand what you think the scope of our decision last time was. That's a good question. Is it essentially that the entire cladding of a 76-story building is a curtain wall and if something less than that comes in, it's not the finished product? Well, as appellants have said in our brief, this court has ruled on what is a curtain wall decision of Commerce, but that we submit Commerce looked at what was a curtain wall unit or part that was not what we would consider the complete curtain wall to be the entire building. And this is the case because Commerce specifically declined to consider that issue. They said that in their scope ruling as well as the trial court acknowledging that was the case. We're talking about what happened in the previous case? Yes. Okay. So they declined to look at that issue. They also said they were not considering what is the finished goods test. So we, appellants, do not believe that the court's prior ruling has any bearing on this case. It certainly did not decide the kit question. It did not. But didn't it pretty clearly indicate that the curtain wall is the whole building cladding and from which it would seem now to follow that importation of less is whatever else it is, is not importation of a kit that contains the end product because it doesn't contain the whole building cladding. Yes, that is what the government is arguing. What appellants would say is that what Commerce has considered to be a finished good kit under the scope language also includes what is a subassembly finished goods kit. They have looked at that language and found that in scaling back what they determine is the finished good or finished good kit, they may find that a product that is a subassembly that is otherwise finished, that is not a complete product, may be excluded. And they implemented this test so as to avoid absurd results or unreasonable ones where they would have to require something that... Like saying the whole 76-story building cladding has to come in at once. At once. And the example I guess was in the... Or the ruling when they established this was a fire truck. So it was a valve component of that fire truck. And they said for us to interpret the scope to say the whole fire truck has to be the finished good is unreasonable. Also, we would say going back and looking at the scope language, there is no limitation or direction that it has to be in one shipment. So you can look at the segments of curtain wall because this is all under a contract to be a full complete good. So you can look at each segment of that as a subassembly or the finished good or you can look at the complete curtain wall because the scope language doesn't limit that it has to be imported in one shipment. And what is your position on what the subassembly is here? The subassembly was... They would have to be shipped in segments and because they can't all be shipped at one time to complete a wall, a side or a building or a section. So we would say that it's anything more than a single... One panel. Yeah. Did the trial court here rely on some facts over and above the fact that you didn't have a complete cladding? Namely, various kinds of attachment devices, caulking, I forget what, gaskets that were not in the same package. And therefore, regardless of what the subassembly unit is, it doesn't meet the requirement of the kit exception to the exclusion because not everything is in the box. Thank you for that question. What the court looked at and what is the department's... What is their third redetermination in this case is that... Sorry, lost my train of thought there. I guess I'm just trying to focus on whether we really have to decide something as broad as you need the whole wall in one ship or whether this particular ruling relies on... There's stuff missing from the particular shipments, even for hanging two of the panels. Well, what we would say is that, first off, this is, again, a full... It is everything for a full curtain wall because it is under contract. So everything will be shipped for that finished good. What Commerce, and I think your question is, they had emphasized what would be what they considered or what they claimed to be additional parts or finishing that would remove... Or they found that these products wouldn't satisfy under the subassemblies test, and that would be what they're referring to as part two of the subassemblies test. Appellant's position is that those are post, I guess, the finishing... Not finishing, but how they are adjusted to the building and not something that is completed for or reworked of the actual material itself. And I think if you look at the scope language that informs the court on what is the actual standard in the subassemblies test... What do you want me to look at? Yeah, I'll see. By JA page is the only way I'm going to find it. I don't have that JA page that's in front of me, but if you do look at the Commerce's third redetermination, which is just past the first slip-off, there is... The full scope there. You have at least an internal page number, like a page number of the third. This is the January 2017, final, final, final Commerce ruling.  And so are we looking at their quote from the original orders? That subject aluminum exclusions may be described at the time of importation as blah, blah, blah, blah, and ending with subject kits? Yes, what we are referring to here in talking about the second part of the subassemblies test is... And this would be the subassemblies test if you're considering the subassemblies of finished good, but it is also the finished goods test. The same rule applies. This is the language that is in, I guess, the seventh paragraph. And it begins with where it talks about the scope also excludes finished merchandise. And within that paragraph, and I can let you find that, they do have the definition of what a finished goods kit is. And what we're saying is in looking at this, that what is the emphasis is the sentence where it says that the... That is into a finished product. So I think the emphasis of being assembled as is means you're looking at what the article is to install it and not the actual installation operations. And the appellants have provided a brief. This is what commerce is focusing on to say that we're not... This article or this merchandise is not passing that second part of the subassemblies test. And I think if you take their conclusion or their finding there to its full application, I think you could read that to say anything short, not only of an assembled curtain wall, fully assembled already at the time of import, but that is in looking at the factors they consider that are additional finishing components, that is weatherized and operations that go to making adjustments, but not to the assembly or discounting the assembled article. So if you follow commerce reasoning, there's really... Anything that could be shipped is something that's completely assembled and weatherized, which is absurd in what is the reason why they established the subassemblies test, to allow for goods that are less than the final downstream finished good. Okay. Thank you. We're reserved a little time for rebuttal. Please proceed. Good morning. Chief Judge Prost, and may it please the court. Jang Ho and Perma-Stilisa do not possess Article III standing to challenge the Uwanda scope ruling, because the Uwanda scope ruling by its very terms does not apply to Jang Ho and Perma-Stilisa. It applies to Uwanda only, based on Uwanda's contract, Uwanda's technical drawings, and Uwanda's import documentation. It applies only to Uwanda, and Uwanda did not appeal. Well, how do you explain then that they're called co-plaintiffs in this case, right? That's right. They brought their own... Jang Ho and Perma-Stilisa filed their own complaints, which were then consolidated into the Uwanda case. And at that point, this issue was not really front and center, because the Supreme Court, such as in the town of Chester, and that line of cases, has held that there's a one plaintiff rule. That as long as one plaintiff is in the case who possesses Article III standing, it doesn't matter that there are other parties tagging along, either as plaintiffs, co-plaintiffs, interveners, what have you. So this issue was not front and center before the trial court... But they had their own complaints, and they were all consolidated. So their complaints were before the trial court, right? That's right, Your Honor. But the three complaints all challenged the same scope ruling based on the same record. So it made perfect sense for the trial court to consolidate those three cases. But you're not saying that our decision, whatever it is, would not bind imports of like products from then on. Is that your point? The commerce decision by... This court's decision would certainly be convenient for Jang Ho and Primus Delisa to concede that this case would bind their companies, but I heard a fair amount of tap dancing. You're saying unless they concede, it's not binding, a final decision on the issue? Such a concession would be convenient but inaccurate. And the reason it's inaccurate is because Jang Ho and Primus Delisa... Well, their complaints, just clarify for me, weren't there complaints about their products? Your Honor, that is their argument, but it's just not accurate. Commerce specific... Well, how could they bring a complaint about somebody else's products? You're suggesting that all of this was just about one set of products and it was not theirs. In other words, you're saying they shouldn't have been allowed to be plaintiffs in the first instance. Your Honor, if we were being particular about it, you're absolutely right, Your Honor. We should have moved to dismiss because... I'm sorry. Just look at, say, Jang Ho's complaint at 590 of the appendix. There's a section starting in paragraph three, standing of the plaintiff. Plaintiff, that's Jang Ho, not Yuanda, produces curtain wall systems and curtain wall units in China and imports them into the U.S. That refers to the scope request of Yuanda. Commerce found the considered curtain wall units subject to the duties. As a result of Commerce's scope ruling, Jang Ho's curtain walls, not Yuanda's, Jang Ho's curtain wall systems and curtain wall units are now subject to the aluminum extrusions orders. Isn't that just a flat, no wiggle room concession that their products are, in fact, now going to be dutiable under the scope ruling that they challenge? And if that's true, which of the three standard Article III standing elements is missing? They're injured, it's traceable to the scope ruling, and it'll be fixed if the scope ruling is overturned. I understand your question, Your Honor, and it would certainly be convenient for us to accept that as a so-called concession. The problem that we have as a principled matter is that that so-called concession mischaracterizes what Commerce has done. Commerce went out of its way to expressly state it was making no finding with respect to Jang Ho and Parmas de Lisa's merchandise. Now, they allege that their merchandise is the same in the complaint and throughout this proceeding. But Commerce made no such finding, and the trial court never considered that question. So what Jang Ho and Parmas… Partly because you never raised it or challenged what appears to be a straightforward concession. Your Honor, but it was never – we're calling it a concession, but it was never alleged. It was never found. I just read the allegation. It's right in the complaint, paragraph three of each of the complaints. I'm sorry. The government has never normally… Are you saying that even though they say, we really would love to pay these duties, you're going to say, nope, nope, we need a proceeding because maybe you don't have to? Is that what you're saying? What I'm saying, Your Honor, is that it remains for another day. Another administrative proceeding is going to be necessary to determine whether or not duties will be imposed. Are they paying cash deposits now? Your Honor, that's not in the record, and I don't have that information, but based on the – I don't have any reason to doubt the representation. Okay, so they're paying cash deposits. They very well may be, but… Why? They're not involved in this case. In our retrospective system of payment of duties, there are cash deposits which are without prejudice to a final determination at liquidation as to whether duties are owed. Those cash deposits may be refunded. Are you going to refund these right after this case, no matter what happens here? I mean, if we were to say they don't have standing and dismiss for lack of jurisdiction, do those cash deposits get automatically refunded at the time? That's the very question, Your Honor. We don't know because there's another administrative determination that is yet to come. Right, and we actually, by coincidence, had a case yesterday that involved this retrospective clawing back and keeping the cash deposits, which I assume may be what happens here. Even if you did another administrative ruling, you'd continue to take cash deposits and say, well, you lost at the end, so we get to keep that money. Well, there is currently pending before the CIT, the Court of International Trade, a ruling. This is only specific to Jang Ho's products, not permissible leases. But Commerce made a ruling that, specific to Jang Ho's products, after a review of Jang Ho's information, there was a failure to cooperate. And Commerce made a determination, in part based on adverse facts available, that Jang Ho's merchandise was subject to the orders. That is pending before the CIT, a challenge to that Commerce determination. That's not before the court. What Jang Ho and Permus DeLisa are asking this court to do, this court of appeals, to make fact findings based on a record that Commerce itself in this proceeding said is insufficient to answer the question of whether Jang Ho and Permus DeLisa are subject to the duties. Do I understand right that the final judgment of the CIT in this case, the last paragraph, does actually command liquidation of their products according to this scope ruling? Yes, it does, Your Honor. So how do they not have standing to challenge that? Well, they requested that, first of all. And they requested their own preliminary injunction, which they shouldn't have received. They didn't have standing to request that relief. But now— Did you agree to it? Your Honor, the United States objected initially, and the trial court indicated it was not inclined to hear that objection. And this was before my time, but ultimately that objection was withdrawn at the court's direction. And here we are. The fact that there was a preliminary injunction and a final judgment that says liquidate in accordance with the decision, that just begs the question, will the decision have any concrete impact on Jang Ho and Permus DeLisa? We've got a commerce decision that says it doesn't apply to Jang Ho and Permus DeLisa. We've got liquidation instructions that are specific to Uwanda. If your view of the absence of Jang Ho and Permus DeLisa standing is right, should the final judgments in 107 and 108, the Jang Ho and Permus DeLisa cases, be vacated? Because in your view, the court had no business ruling about liquidation or the applicability to those two plaintiffs of this scope ruling. Your Honor, it wouldn't be the judgment in favor of the defendant. However, the injunctive portion of it ought to be vacated because the Jang Ho and Permus DeLisa did not possess Article III standing to seek relief separate and apart from Uwanda. So if the injunction shouldn't have gone into effect, does that mean their cash deposits would be automatically refunded? No, Your Honor, because that is a separate administrative determination that has nothing to do with this proceeding. I thought it was related to the injunction, no? No, Your Honor. There is a separate decision in the context of an administrative review. There's a separate commerce decision that pertains to Jang Ho's products, and that is the subject of litigation before the CIT. It may reach this court, but it's not before the court today, and that's our point. Why did you agree to consolidation if your view is that from the get-go this scope ruling could not possibly be litigated by these two appellants? The late Judge Pogue indicated that he was not inclined to hear our standing arguments at that time, and so what we had were three complaints challenging. Did you raise them on paper, or is this all oral? This was at an oral hearing. The Judge Pogue indicated that he was not inclined to hear the standing arguments at that time, so what we had were three complaints challenging the same scope ruling on the same administrative record, and it's standard practice for the government to move to consolidate those. At that point, we principally litigated Uwanda's arguments. That was the crux of the entire case. Jang Ho and Pernas-DeLisa were weighing in, and I have no doubt that while arguing that their product is exactly the same, in the subsequent case, if this court dismisses for lack of jurisdiction, I have little doubt that they will discover distinctions between their product and Uwanda's product. Well, it seems to me what they said in their complaint is, I don't know, I can't think of a reason that's not a binding admission. Your Honor, I— But I may not be creative. I don't think there's judicial estoppel here because no one relied on that. No, the trial court never addressed it. We never litigated that question. The question of whether their product is the same is something that the trial court didn't look at, commerce didn't look at, and they are asking this court to make that fact-finding on the very record that commerce said was insufficient to make that determination. It's a little role—it's odd, isn't it? It's a little role reversal. I mean, you're acting as if you're trying to save them for themselves. Your Honor— And the ability to preserve an argument that challenges what happened here. Your Honor, sometimes doing the right thing is not convenient. But we feel quite strongly about this. And it's important to note that this doesn't come up very often. It is true that the interested party statute is very broad. And in 99 cases out of 100, perhaps, the interested parties under the statute are going to possess Article III standing as well. It's only because of the particular circumstances in this case where Jang Ho and Permis de Lisa, they're not affiliated with Uwanda. They're competitors. They don't—Jang Ho and Permis de Lisa, they don't import Uwanda's merchandise. They didn't request their own scope ruling. So why is it—assume that the scope ruling here says Uwanda's products, but it says the reason for these products being within the two duty orders are the following four things. Why might that not be enough for standing if they say, we have those four things, even though the specific—we're not subject in some adjudicatory sense to the Commerce Department's order. But the order has a broader effect than the bottom line judgment, if that's what you want to call it, for Uwanda. Why would the three-part standing test not be satisfiable? That is, if we can get a reversal of the ruling that these four factors make the duties applicable, then we will quite, quite likely benefit. Maybe not even a certainty, but certainty is not required for standing. Your Honor, the particulars of this case, Commerce's decision, was not made with broad applicability. Uwanda made its scope request to benefit itself, not its competitors. Uwanda's scope ruling was based on its technical drawings, its particulars of its contractual arrangements, its import documentation. And that's what Commerce determined and made a conclusion based upon. Commerce did not have any of that evidence with respect to Jang Ho and Kermis Talisa. And so— Right, but standing is not a question for Commerce to decide. It's a question for the court to decide. And they come in and they say, geez, those four characteristics, we have as well. That's right, Your Honor. So they're injured because you want money from them. Traceable to the scope ruling because the scope ruling's rationale is really, really likely to mean that those duties will—they will have to pay those duties. And if we can get the Commerce Department ruling reversed, then redress is likely. Their argument asked the court to assume its own jurisdiction because their argument that they make the same product and import it in the same way, that— But standing is always based on a set of assertions of facts. Yes. And at a pleading stage, you kind of take the facts as a given. And if you want to go beyond the pleading stage as a defendant, you have to contest those facts, which you didn't. Well, the—we have contested the question of whether the products are the same has not been litigated. It's certainly never been conceded. We would have—we would be in a very different situation if Jang Ho and Permos de Lisa had come into the court and said, we know that Article III standing is at issue. And so we've come in with declarations or affidavits or other competent evidence in order to establish their cognizable interest. But they never put their name on the dotted line under oath to demonstrate to this court with competent evidence that they possess standing. Instead, what they have done is they have relied on the commerce record— I'm sorry. But all we have in their cases is the complaint. And in a complaint, people don't submit oaths. That's not a stage for evidence. And if you were in a kind of a normal district court case, complaint makes certain factual allegations. If the defendant wants to contest standing, the defendant has to contest standing. And at that point, there might be a summary judgment or other proceeding in which evidence is actually at issue. But we never got to that in this case. Your Honor, it was never litigated. It was never litigated. It was never conceded. And just to answer Your Honor's question about where are the orders in the joint appendix, you had asked at previous counsel. You mean the underlying duty orders? Yes. No, I have those. Oh, you found those. Okay. Very good. Maybe we could say something about the merits. Sure. If the court reaches the merits, the trial court correctly sustained the scope ruling which found, based on substantial evidence, that Uwanda's curtain walls are not imported as a kit and don't meet the finished goods kit exclusion in the orders. The commerce analysis was straightforward. The orders exclude finished goods kits that contain, at the time of importation, all parts needed to assemble the finished product as is without further finishing and fabrication. And your view is? It flunks all three. I'm sorry. Your view is that the curtain wall is the complete cladding of a 76-story building, and if the kit doesn't include that, then we're not in the kit exception. Commerce, in its 250 pages of analysis in this matter, did say that if Uwanda and the other exporters chose to import, around the same time, all the parts necessary to assemble the final finished product. And that's the cladding of the whole building? Yes, consistent with the petition exhibit, which suggested that that might be a possibility. They could do so. But in this case, Uwanda's curtain wall parts are imported in many entries, in multiple times, according to a contract schedule, not as a single kit. And Uwanda's technical drawings and contract documents showed that the curtain walls required steel embeds and other components for assembly that are not shipped at the same time. Not all of the parts needed to assemble the final curtain wall. And they're not assembled as is either. Uwanda's curtain wall units also require cutting, punching, waterproofing during assembly. That's not as is. It doesn't meet the requirements of the kit test. How much of what you just said would apply to your colleague's argument about sub-assemblies? Say, I think I heard her say, take two of these panels. Two together would be a sub-assembly. And so, first of all, do you disagree that a box on the ship that contains two panels and everything you need to put them together so that if that were the entire building, it would be finished, do you disagree that that would be excluded from the duties? Because it's not the whole building. We do disagree, but also, Your Honor, the sub-assembly test, for several reasons, doesn't make any sense in the context of this case. The curtain wall units themselves are not assembled into a curtain wall and then fastened to the building. Instead, each curtain wall unit is individually hung on steel embeds and attached to the building in each unit, unit after unit after unit, in order to assemble the complete curtain wall. So you cannot assemble the curtain wall without the steel embeds and all the other components that Commerce identified in the BPI portion of the opinion in order to assemble the confidential material. Oh, sorry. Business proprietary information. I apologize, Your Honor. Too many. Getting to trade jargony here. So Commerce identified you can't assemble the curtain wall without these steel embeds. The curtain wall units, they don't bear a load. They're individually attached. So I'm hearing for the first time that two curtain wall units are a sub-assembly. They're not because they're not assembled at the time of importation. They're assembled after importation. I guess maybe I misunderstood. I was understanding her to say something like a crate that contains everything that would be necessary to put together two panels, truly everything, would be a kit for creating a sub-assembly, and therefore that would be excluded from the two duty orders. Not on this record, Your Honor, because even those curtain wall units Commerce found were not assembled as is. They required further finishing and fabrication, cutting, punching, waterproofing. That is further fabrication. It does not – it runs afoul of one of the requirements of the finished goods. So your view, just maybe this completes my inquiry on this. Your view is that to uphold this order does not require that we say whenever less than the entire building cladding is part of the shipment, the exclusions from the two duty orders are inapplicable. Even if we focus more narrowly, there's still stuff missing from the crate. That's right, Your Honor, and I think that was the approach that Judge Gordon took in the trial court below, that because there were further components and further fabrication that was necessary in this case, we didn't need to reach the additional defect in the reliance on the finished goods kit that these were entered at multiple entries and multiple times over a period of months or even years. If I could just sum up. In sum, because Jang Ho and Permis de Lisa do not possess Article III standing and substantial evidence, supports Commerce's findings, the court should dismiss for lack of jurisdiction or affirm. Thank you. Thank you. OK, we'll restore a couple minutes for each of you if you need it, because we've gone over. Oh, I'm sorry. Mr. Spooner, I exceeded two minutes. That wasn't indicated on my sheet. We responded to the oral argument order. Oh, OK. Well, fine. Let's go for two minutes, and we'll compensate you all accordingly. But we're going to try to hold you to your two minutes. I will adhere to it, Your Honor. I will be mercifully brief. May it please the court, my name is David Spooner, and I'm counsel for Defendant Tappalese, the Curtin Wall Coalition, three West Coast manufacturers of curtain wall units and systems. If I may, I'd like to make just one point from an industry perspective about the nature of the product at issue, Iwanda's so-called curtain wall kit. In its application for a scope determination, Iwanda, as the court knows, provided Commerce with a contract for the construction of a curtain wall and with a customs entry packet, and asked Commerce to compare the list of parts in the customs entry packet to the contract and defined, of course, that Iwanda's imported parts constituted a finished good kit excluded from the order. The record is replete with evidence, though, that Iwanda's imported parts fail each prong of the scope's finished goods kit exclusion for reasons, and this is why I will be brief, the government, I think, so ably recounted. First, Iwanda does not import many of the parts necessary to construct a curtain wall. And for this notion, I'd steer you, please, to page 67 of the joint appendix in which Commerce, in its final remand redetermination, compared Iwanda's technical drawings to Iwanda's customs entry documents and found many parts missing. Second, Iwanda's imported parts require further finishing and fabrication. And for this, I'd simply steer you to page 35 of the joint appendix where the lower court has a long list of further finishing and fabrication arguments, a list so long I'd use up my remaining 30 seconds recounting them all. Simply put, these imported parts are not LEGOs, giant LEGOs that attach themselves to the outside of a building. With respect to standing, I'd simply say that these projects are so massive and include so many parts that one can't simply assume that the customs entry documents, the imported parts of Permis de Lisa and Jang Ho, are just like that of Iwanda. And with that, I would thank the court. Thank you, Your Honor. And respectfully ask the court to approve the lower court decision. Thank you. All right. Well, to keep it even, we'll give you each three minutes, but hopefully that won't even be necessary. So we'll give both of you in order to respond to what's been raised here. Thank you, Your Honor. I don't believe I'll need three minutes. Just a couple of quick points about standing. I'm hearing the United States claiming that perhaps appellants shouldn't have been allowed to be plaintiffs in this case. That's what I thought I heard, and I don't understand what the basis for that is. The statute is very clear that statuses and orders of the subject merchandise that were entitled to commence an action. They're not making a statutory argument. Their sole argument is constitutional, and the statute can't give Article III standing if it doesn't exist otherwise, at least not as the injury. Right, but they are attacking the basis for the statutory standing in a sense by doing that because they're claiming somehow that they don't have the interest in the merchandise in some way. And the way they're getting to that is by raising what I think really are merits arguments. When I hear them talk about parts lists and whether or not all the materials are ready at the time of assembly, at the time of importation to assemble the product, which addresses the exclusion, what they're talking about there really are merits. The product itself hasn't changed. We have a curtain rule. We import curtain rule. So we have statutory standing in that case. The other arguments as to whether the exclusion is met or not really gets into the merits. It really isn't a standing issue. So no one questioned whether we had standing all along because the product is understood to be the curtain rule. It was only really later in these proceedings when an issue was raised as to whether we should be looking at a parts list or not. We disagree. We disagree with the premise of that. We don't believe any of that stuff. Mr. Edelshick made, I think, a reference to how there was at least an oral objection to standing made before Judge Pogue that was then dropped. Do you have a different memory or understanding of the record? I'm not going to say that's wrong because I don't recall specifically. But what I do know is that the merchandise hasn't changed. And whether or not somebody is going to qualify for the exception here because of lack of a complete parts list or something along those lines, that really gets into really what the merits are. In other words, you can't win this case because we really don't know what your parts lists are. That gets into the actual final determination as to whether we're going to prevail or not. And whether we're going to prevail or not really isn't the issue for standing. It's whether we have the interest in the product, whether it's the same product, and whether the scope will apply to it. So with respect to that point, I don't think there's any validity to it. Also, the issue of Django's other case that was raised. There is an appending case in the Court of International Trade regarding the second administrative review where this issue had come up. Commerce claimed that Django didn't have enough information on the product to make a determination. Our position was, well, self-initiate a scope for Django, which they did. And that case has been stayed. But that's a different period of time. Okay. Well, we agree with that, that that's not really relevant and your time has expired. Thank you. Thank you. To talk about what is at issue before the court and going back to the scope language, the question is, does the finished goods kit exclusion apply? And as we provided in our briefs, there is the general scope language for the finished exclusion kit. There is also what Commerce has scaled back to find is a subassembly finished goods kit. And if you take that product that is the subassembly, what Commerce is obligated to do is stop its analysis and evaluation of what is the finished good at the subassembly. So for the fact that government says there are these additional processes or alleged components or parts that are needed, that's effectively irrelevant when you're talking about a subassembly. And I think you can see that by seeing how Commerce has applied this in other of their rulings. The very one that they adopted it in, the site control, SMBCs for short, that they didn't talk about installation of that valve on the fire truck at all. There was no discussion of it. I think the other case we cited or that the ruling we cited in our brief is a portals case, which was a structure that where Commerce found the ultimate end good was a retail entranceway. So the structure that was somehow attached to it with no discussion of how it was attached to it was what Commerce called a subassembly finished good kit. So I think in looking at it in that perspective, the emphasis that Commerce puts on the additional components or processing or finishing isn't relevant. But even if you are going to say that the curtain wall is the final finished good, what we talked about before and what is in our briefs is that those components and what Commerce has cited to as finishing are really operations that are not impacting the material item itself. I think if you think about the finishing or fabrication, if you imported something and you welded something onto the curtain wall to make it hang on the building or drilled it in such a way, maybe that would be fabrication or did some sort of finishing to the aluminum. But that's not what they're talking about here. Again, this material is confidential, so we're limited in walking through one by one. But what they're talking about is nothing that's done to the product. Because again, it is ready to be installed as is. And going back to the scope language, that is all that is needed for this. It needs to be assembled as is, meaning as it is, not what is done to it to make it into, install it into the product. Okay, your time has expired. Thank you. We thank both sides and the case is submitted.